1

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8                 FOR THE DISTRICT OF OREGON

9

10  REBECCA KRONINGER,              )
                                    )      No.  07-1898-HU
11               Plaintiff,         )
                                    )
12      v.                          )
                                    )      FINDINGS AND
13  FEDEX CORPORATE SERVICES, INC.) )      RECOMMENDATION
    and JENNAFER MARCHETTI,         )
14                                  )
                 Defendants.        )
15  _____)

16  Dennis Steinman
    Matthew C. Ellis
17  Kell, Alterman & Runstein
    520 S.W. Yamhill, Suite 600
18  Portland, Oregon 97204
         Attorneys for plaintiff
19
    Laura T.Z. Montgomery
20  Gleaves, Swearingen, Potter & Scott
    975 Oak Street, Suite 800
21  Eugene, Oregon 97401

22  Keith R. Thomas
    Federal Express Corporation
23  3620 Hacks Cross Road, Bldg. B, 2d Floor
    Memphis, Tennessee 38125
24       Attorneys for defendants

25  ///

26  ///

27

28  Findings and Recommendation Page 1

HUBEL, Magistrate Judge:

This is an employment discrimination action brought by Rebecca Kroninger, formerly employed as a salesperson, or account executive (AE) at FedEx Services (FedEx). She asserts federal and state law claims for sexual harassment by her female supervisor, District Sales Manager (DSM) Jennafer Marchetti, under Title VII of the Civil Rights Act of 1965 (Title VII), 42 U.S.C. § 2000e-2(a) and Or. Rev. Stat. § 659A.030; federal and state law claims for retaliation under Title VII, 42 U.S.C. § 2000e-3(a) and Or. Rev. Stat. § 659A.030; a common law claim for wrongful discharge; and a claim for retaliation under the Oregon Family Leave Act (OFLA), Or. Rev. Stat. 659A.159. A claim under the federal Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2612(a), 2614(a), and a common law battery claim have been voluntarily dismissed. Defendants move for summary judgment on all remaining claims.

**Factual Background**

Kroninger was hired on June 1, 2000, to work in FedEx's Mt. Hood District. The Mt. Hood District covers the entire state of Oregon and a small part of Washington around Vancouver. The Mt. Hood District office is in Tualatin, Oregon. Declaration of Jennafer Marchetti ¶ 3. Beginning in January 2005, Kroninger was supervised by District Sales Manager Jennafer Marchetti, who reported to Chris Suhoza, Managing Director for the Northwest Region. Id. Suhoza, in turn, reported to Rich Cocuzzo, Vice President of Sales, West Division. Id.

///

Findings and Recommendation Page 2

1   Kroninger received a copy of the FedEx Services Employee

2  Handbook (Employee Handbook) in July 2000, shortly after she was

3  hired. The Employee Handbook refers employees to, and provides a

4  web address for, a supplementary intranet site, which contains on-

5  line versions of FedEx employment policies, including those

6  regarding harassment. Declaration of Sharron Jackson, Exhibit A.

7  The Employee Handbook contains a general provision on

8  discrimination, harassment and retaliation, which is as follows:

9       It is an employee's responsibility to report any
10      incidents of employment discrimination or harassment
        immediately to a member of management or Human Resources.
11      All complaints will be promptly and thoroughly
        investigated in as confidential a manner as possible.
12      Employees are protected by the Company and federal
        statutes from coercion, intimidation, retaliation,
13      interference, or discrimination for filing a
        discrimination or harassment complaint. FedEx Service
14      specifically prohibits such action on the part of its
        management and other employees.

15  Id. The webpage contains links to various FedEx policies and

16  procedures relating to employment, including discrimination and

17  harassment, and identifies the form to be completed and returned to

18  Human Resources (HR) complaining of discrimination and harassment.

19  Id. at ¶ 14, Exhibit C.

20      In June 2005, FedEx discontinued the distribution of the

21  Employee Handbook in hard copy form and maintained its HR policies

22  and procedures solely on the website. Jackson Declaration ¶ 9.

23  FedEx maintains an Alert Line, a 24-hour, toll-free phone line that

24  allows employees to report, confidentially, suspected violations of

25  the law or FedEx policies. Declaration of Kathie Walthall ¶ 15.

26  ///

27

28  Findings and Recommendation Page 3

1   During the time she worked for FedEx, Ms. Kroninger had access
2   to the FedEx intranet, and knew she could contact a FedEx HR
3   representative if she had questions about FedEx's employment
4   policies.

5   During 2005 and 2006, FedEx posted a commercially available
6   poster-size notice of relevant employment laws in the employee
7   break room of the facility in Tualatin. Marchetti Declaration ¶ 5.
8   One of the sections of the notice addressed employees' rights under
9   OFLA. Id.

10  Kroninger's job as an AE involved selling delivery services to
11  customers within their territories and across three service
12  categories, also known as "portfolios:" Express, Ground and
13  International. Accounts were classified into two types: Primary and
14  Secondary. Id. at ¶¶ 10-11. Primary accounts are those with a
15  customer spends between $40,000 and $1.5 million a year. These
16  accounts are "owned" by the AE, who is responsible for all aspects
17  of maintaining the account. A secondary account is a worldwide or
18  corporate sales account in which the customer spends more than $1.5
19  million a year. Secondary accounts are "owned" by a worldwide or
20  corporate account manager, although the AE works with and assists
21  that person in maintaining the account as it relates to the
22  shipment of packages within the AE's assigned territory. Id. at ¶
23  11.

24  AEs have two performance categories they are expected to meet
25  during a fiscal year, which at FedEx ran from June 1 to May 31. The
26  first is called "Goal Attainment," which represents the extent to
27
28  Findings and Recommendation Page 4

which the AE meets his or her overall revenue goals, expressed as a percentage of actual dollar amounts of revenue from the AE's territory compared to the revenue forecasted for that territory. AEs are assigned revenue goals based on the expected revenues from customers in their particular territory. Although the actual dollar amount of the revenue goal for each AE is different, depending on forecasted revenue for each territory, the Goal Attainment requirement is the same for each AE. _Id._ at ¶ 12. For FY 05 and 06, AEs were expected to achieve a minimum of 100% of their revenue goals for each quarter, for each of their three portfolios. Thus, AEs were not paid incentives based on total revenue, but by the percentage of Goal Attainment. For example, an AE with $1.5 million in revenue on a revenue goal of $1 million would have 150% Goal Attainment, and would receive a larger bonus than an AE with $3 million in revenue on a revenue goal of $3 million, which is only a 100% Goal Attainment. _Id._ at ¶ 14.

The second performance category is known as "Activations." Activations are new or incremental business gained from a customer account. _Id._ at ¶ 15. Activations are expressed in terms of the Average Daily Net Revenue (ADNR), which is a 21-day average of the actual dollar amount shipped on an account in a particular month. _Id._

For FY 05, AEs were required to activate a minimum of $400 ADNR, $200 of which came from Primary accounts. The AEs did not have to meet a specific minimum ADNR for secondary accounts and they were not required to meet specific minimum ADNR amounts per

Findings and Recommendation Page 5

portfolio. Id. at ¶ 17.

In FY 06, AEs were still required to activate a minimum of $400 ADNR, but the amount of ADNR that was to come from primary accounts increased from $200 to $300, and the AEs were required to activate $100 from secondary accounts. Additionally, the AEs were expected to activate specific amounts from primary accounts in each of the three portfolios. Id. at ¶ 18.

AEs were informed of their required goals and performance expectations in different ways, including individual coaching sessions, team meetings, performance reviews, etc. Id. at ¶ 20. Marchetti states that in addition to these methods, in February 2005, she provided her AEs with a document which addressed their primary expectations for FY05, and in December 2005, she provided the AEs with a similar document which addressed their primary expectations for FY06. Id., Exhibit A.

At the start of each fiscal year, AEs were given annual evaluations of their performance for the previous fiscal year. Id. at ¶ 24. The review form, known as a Performance Planning & Evaluation (PPE) is broken down into five objectives, each of which is assigned a percentage value: Goal Attainment (30%), Activation (30%), Self-Development/Compliance (10%), Customer Experience (15%), and Territory Management Activities (15%). The AE is given a rating for each category of "Exceeded Expectations," "Achieved Expectations," or "Needs Improvement." Id.

According to Suhoza, before Marchetti became DSM in January 2005, several of the AEs in the Mt. Hood district, including

Findings and Recommendation Page 6

Kroninger, failed to meet several of their sales goals for the first two quarters of FY 2005. Suhoza Declaration ¶ 11. In December 2005, Suhoza approved the termination of a Mt. Hood AE, Mike Cummings, for poor performance. Id. at ¶ 12. The AE had a history of failing to meet sales expectations, and had received a Letter of Counseling, a Letter of Warning and a "Needs Improvement" rating on his last annual performance review. Id.

In the spring of 2005, Marchetti and Suhoza redrew the territories of the AEs using a computer program known as Route Smart. Marchetti Declaration ¶ 41. In April 2005, Marchetti told Kroninger that the territories of McMinnville, Newberg, and Yamhill County were to be added to her territory, and that her territory in downtown Portland was being transferred elsewhere. Id. The actual change in territories did not take place until June 2005, the start of FY06. Id.

Kroninger alleges that in May 2005, Marchetti sexually harassed her by saying she thought Kroninger's hair looked better curly. Kroninger dep. 162:7-24; see also Walthall Declaration Exhibit I. She acknowledged at her deposition that she never told Marchetti she thought the remark was inappropriate, and that she never reported the remark to management. Kroninger dep. 164:22-165:3. She has testified that Marchetti sometimes called her "girl," "girlie," or "sister," id. at 162:6-7, 165:4-11. However, when asked about an email in which Marchetti said, "Good one. Go get them girl," referring to one of Kroninger's new accounts, Kroninger said she found the remark unprofessional, but not

derogatory. Id. at 176:6-15. Kroninger testified that she never asked Marchetti to stop calling her "girl," "girlie," or "sister," and never complained to management or HR about it because she was afraid to. Id. at 177:1-14.

In June 2005, Kroninger was given a PPE by Marchetti. Marchetti Declaration, ¶¶ 25-28, Exhibit C. Under the category of Goal Attainment, Kroninger received a rating of "Needs Improvement," because she was under 100% for all but one of her revenue goals. Id. She also received a rating of "Needs Improvement" in Activations because she did not have $400 ADNR in Total Activations. Id. She received "Exceeded Expectations" and "Achieved Expectations" ratings in two other categories, but another "Needs Improvement" rating in a third. Id. Her overall rating for the PPE was "Needs Improvement." Id. at ¶ 28. Kroninger testified that she has no basis for disputing the accuracy of the numbers on her PPE. Kroninger dep. at 24:5-22; 25:5-21.

Kroninger alleges that in the same month as the PPE, June 2005, Marchetti made sexually suggestive remarks to her during a company outing to Las Vegas. Kroninger testified at her deposition that Marchetti asked if Kroninger were interested in women and whether Kroninger had slept with a friend of Kroninger's whom Marchetti had met. Id. at 196:21-25, 197:12-17. Marchetti told Kroninger she liked to come to conferences to see "how many people she can sleep with," id. at 199:9-15, and also made a remark about having long fingers, which Kroninger interpreted as a "suggestion that she was coming on to me, that she would provide those services

for me," i.e., "sleeping with me." Id. at 198:12-199:14. Kroninger
did not, however, ask Marchetti what she meant because "I kind of
just assumed that that's what she was talking about." Id. at 199:4-
8. Although she was offended, Kroninger did not report the incident
to anyone in management or HR at FedEx because "I really honestly
felt that it wouldn't do me any good." Id. at 204:14-23.

Marchetti and Suhoza routinely had discussions throughout 2005
and 2006 about the performance of the Mt. Hood District and the
sales performance of Marchetti's individual team members. Suhoza
Declaration ¶ 15. Marchetti kept Suhoza advised of her team
members' successes and failures; there were also times when Suhoza
independently reviewed the sales figures for the Mt. Hood District.
Id. In late June 2005, Marchetti advised Suhoza that there were six
AEs who had failed to meet one or more of their required objectives
for FY05. Marchetti Declaration ¶ 37; Suhoza Declaration ¶ 16. The
two agreed that each should be issued a Letter of Counseling.
Marchetti Declaration ¶ 37; Suhoza Declaration ¶ 16. Marchetti and
Suhoza consulted with HR, which reviewed and approved the letters.
Suhoza Declaration ¶ 16. The Letters of Counseling were sent to
Kroninger, Candace Bornac, Chris Forzano, Brad McLafferty, Bryan
Mikota, and Lori Thurston. Suhoza Declaration, Exhibit D.

Kroninger asserts that in July 2005, Marchetti harassed her by
saying to Kroninger and another AE, Candace Bornac, "Wouldn't it be
fun for all of us to go out together?" Kroninger dep. 190:4-16;
Declaration of Kathie Walthall, Exhibit I. Kroninger testified that
at the time, she "laughed about it," Kroninger dep. 191:1-3, and

Findings and Recommendation Page 9

"didn't take it seriously." Id. at 192:11-14. Kroninger did not report the comment to anyone in FedEx management or HR. Id. at 192:15-16.

On July 6, 2005, Kroninger and the five other AEs in the Mt. Hood District got Letters of Counseling for poor performance. Id., Exhibit F; Suhoza Declaration, Exhibit D. Marchetti has testified that a Letter of Counseling is "designed to advise employees of performance deficiencies and provide them with suggestions as to how to improve." Marchetti Declaration at ¶ 37. The Letter of Counseling given to Kroninger stated that it was being provided as a "written recap of our discussion on July 6, 2005," and that the specific area of unsatisfactory performance "is your overall FY05 Activations." Id. at Exhibit F; Suhoza Declaration Exhibit D. The letter stated that over the last 10 months, Kroninger had "hit the activation standard only three times." Id. Attached to the letter was a copy of Kroninger's prospect list; the letter noted that

> [c]urrently you have zero opportunities that have a 90%
> probability to close ratio. Rebecca, this concerns me as
> we are in the second month of the first quarter. You
> should have prospects in your funnel ready for you to
> close each month.

Marchetti Declaration at Exhibit F. The letter stated that as part of "this improvement initiative in the area of new activations," Kroninger was to send Marchetti a progress report on Kroninger's business plan and email Marchetti every Friday with the number of sales calls for the week that Kroninger had made to her prospects. Id. On July 11, 2005, Kroninger acknowledged that she had read the letter and that failure to correct her performance might result in

further disciplinary action. Id. Kroninger has testified that she has no basis for disputing the numbers or statements made in the letter. Kroninger dep. 47:13-24; 49:2-7.

According to Suhoza, for the first quarter of FY06 (June 2005-August 2005), Kroninger continued to fail to meet most of her sales goals, both in terms of goal attainment and activations. Suhoza Declaration ¶ 17.

Kroninger asserts that in August 2005, Marchetti sexually harassed her by saying, in response to Kroninger's telling Bornac that she was going home to take a shower, "the only shower you're going to be taking is at my house." Kroninger dep. 209:1-5. Kroninger testified that her response to this was "like, yeah. I'm out of here," id. at 209:13-14, and that she "didn't take it seriously." Id. at 209:25-210:3. Kroninger has testified that after this remark, Marchetti walked her to the parking garage, where she said Kroninger was "awesome," and gave her a hug. Id. at 210:9-17. Kroninger did not say anything to Marchetti. Id. at 210:18-19. Kroninger did not complain to anyone in management or in HR about this episode. Id. at 211:20-25.

Kroninger failed to meet her sales goals in September 2005. Suhoza Declaration ¶ 17. On September 28, 2005, Marchetti issued Kroninger a PPE for the first quarter of FY06 (June-August 2005). Marchetti Declaration at ¶¶ 46, 47, Exhibit H. Kroninger did not meet Goal Attainment for any of her revenue goals and did not meet her total Primary Activations goal. Id. She met her Secondary goal once. Id. Her ratings were "Needs Improvement" in three areas,

Findings and Recommendation Page 11

"Achieved Expectations" for one area, and "Exceeded Expectations" for one area. Id. Because 70% of the performance categories were rated at "Needs Improvement," she received an overall evaluation rating of "Needs Improvement." Id. at ¶ 47.

Kroninger has testified that on September 28, 2005, Marchetti sexually assaulted her. Robin Labaw, a senior sales executive, had asked Kroninger to set up a meeting after work at Kroninger's house in which Labaw, Kroninger, and Bornac would go over a spreadsheet. Kroninger dep. 214:18-25. Labaw called Kroninger before the meeting to say that Bornac could not come, but that she would. Id. at 215:23-216:2. Kroninger got a call from Marchetti before the meeting asking why she had not been invited. Id. at 216:11-14. Marchetti said she was coming to the meeting. Id. at 216:20-21. Labaw came to Kroninger's house and later Marchetti arrived. Id. at 217:17-25. Kroninger went outside as Marchetti drove up. Kroninger testified that Marchetti appeared to have been drinking, and that she hugged Kroninger and was "overly friendly." Id. at 218:6-22. Kroninger claims that Marchetti told her, "I'm not here for the work. I'm here for you," and attempted to kiss her. Id. at 219:1-5. Kroninger turned away and "just kind of scuffed it off like, yeah, right, whatever." Id. at 219:4-5. Once inside, Marchetti asked for a tour of the house. Id. at 223:23-25. Kroninger testified that during the tour, in Kroninger's bedroom, Marchetti opened the night stand drawer, found some sex toys, and said, "This is where Momma has fun." Id. at 227:1-18. After the tour, Kroninger's then husband and 13 year old son arrived home. Id. at 225:11-20.

Findings and Recommendation Page 12

Labaw states in an affidavit that she had the spreadsheet and graph on her laptop computer. Labaw Affidavit ¶ 10. Kroninger testified that Marchetti then went and sat "really close" to Robin, who had her laptop open. Marchetti said, "What do we have here?" and then slammed the laptop shut, saying, "We're here to party." Kroninger dep. at 228:24-229:11. Labaw corroborates this testimony in her affidavit. Labaw Affidavit ¶ 11. The three watched a videotape of Kroninger singing at a United Way telethon. Kroninger dep. at 229:15-23. Labaw then announced that she needed to leave to pick up her daughter, and left. Id. at 229:25-230:20. It was about 9:15 p.m. Id. at 230:21-22. John and Rebecca Kroninger and Marchetti decided to go to a restaurant for dinner and drinks. Id. at 231:1-2. On the way to the restaurant, Marchetti asked to go to the Boom Boom Room, a strip club. Id. at 231:15-17. Kroninger, feeling that she "needed to just go along" with her and feeling "powerless," agreed. Id. at 232:1-19. Kroninger and her husband had been to the Boom Boom Room together several times. Id. at 235:20-24. While sitting at a table in the Boom Boom Room, Marchetti told Kroninger she had a crush on her, and told John Kroninger she had a crush on his wife. Id. at 239:24-25; 242:2-4. Marchetti also put her hand on Kroninger's knee under the table. Id. at 242:11-20. The three were at the Boom Boom Room drinking for about an hour. Id. at 240:22-241:19. They left the Boom Boom Room and drove through a fast food place, then returned to the Kroninger home to eat it. Id. at 244:13-22; 19-21. When Kroninger's husband went outside for a cigarette, Marchetti "cornered" Kroninger against cupboards in the

Findings and Recommendation Page 13

hallway and "threw me against the wall and started kissing on me." Id. at 247:9-12. Kroninger pushed Marchetti away and told her to "please stop." Id. at 247:13-14. Later, while the three were eating, Marchetti said she wanted to get into the Kroningers' hot tub, and John Kroninger agreed. Id. at 248:15-23. Kroninger testified that she also agreed because she was "afraid of what would happen if I didn't go along with what she was requesting." Id. at 249:1-4. Kroninger testified that both Marchetti and John Kroninger were drunk, id. at 249:14-19, but that she had had only two drinks. Id. at 250:14-15. All three got into the hot tub; this was about 1:00 a.m. Id. at 267:5-8. Kroninger was wearing a sports bra and underwear; John was wearing shorts; and Marchetti "had her top off" and was wearing just her bikini underwear. Id. at 250:24-251:17.

Kroninger testified that she was "really afraid of retaliation" if she didn't do what Marchetti said. Id. at 257:12-13. This fear was based on the counseling letter she had received, id. at 257:22-23, but not on anything Marchetti said, such as threats of discipline or termination. Id. at 258:10-24. Kroninger testified that she "felt there was a threat there," even though Marchetti never specifically threatened Kroninger's job except through the counseling letter. Id. at 259:1-15.

The three sat in the hot tub, and Marchetti said to John Kroninger, "Your wife is playing hard to get." Id. at 260:12-17. Then John Kroninger left to smoke a cigarette. Id. at 260:1-4. Marchetti moved closer to Kroninger, "coming on to me forcefully,"

Findings and Recommendation Page 14

and saying, "Don't you want your boss? Don't you want your boss?"
Id. at 261:11-15. Kroninger told Marchetti, "this is
inappropriate." Id. at 261:16-18. Marchetti kept "pushing and
pushing" Kroninger, straddling her, until she thought she was going
to go under the water, and Kroninger said, "Get the fuck off me,"
and pushed her off. Id. at 261:19-25, 262:5-6. Kroninger was asked
whether Marchetti said anything suggesting that if Kroninger did
not go along something bad would happen to her at work. Id. at
262:15-17. Kroninger said no, but "it was implied" by "just her
persona. She has a very strong personality." Id. at 262:20-22.
Kroninger testified that Marchetti never threatened her with
retribution if she failed to go along, id. at 263:2-6, never
promised her a benefit if Kroninger had sex with her, and never
threatened her with any negative action if Kroninger did not have
sex with her. Id. at 287:24-288:7.

Kroninger has testified that as a result of the September 28
episode, she has post traumatic stress disorder. Id. at 267:24-268-
11. See also Kroninger dep. Exhibit A, ¶ 35 (complaint to Oregon
Bureau of Labor and Industries (BOLI), stating that on March 2,
2006, a psychiatric nurse diagnosed her with PTSD "on account of
the severe and pervasive sexual harassment at the hands of
Supervisor Marchetti and prescribed an antidepressant.")

John Kroninger returned and told them to get out of the hot
tub. Id. 263:7-11. The Kroningers decided let Marchetti "sleep it
off" in the downstairs bedroom. Id. 263:22-264:1. Kroninger showed
Marchetti to a bedroom and went upstairs. Id. 265:9-12. Kroninger

Findings and Recommendation Page 15

says she heard "some rumbling" in the downstairs bedroom and went back downstairs. Id. 265:13-14. She found Marchetti naked, lying on the bed, and says Marchetti said, "Come on. Come in bed with me. Don't you want me?" Id. at 265:14-16, 20-22. Then Marchetti called Kroninger a bitch and a tease when she refused her advances. Id. at 265:17-1. When Kroninger woke up the next morning, Marchetti had left, leaving her shoes and her watch at the house. Id. at 269:6-15.

John Kroninger has submitted an affidavit corroborating most of Kroninger's version of these events.

At her deposition, Marchetti testified that she went home from Kroninger's house after watching the United Way telethon videotape. Marchetti dep. 157:12-158:12. She testified that she slept at her own apartment that night, going to bed between 10 and 11 p.m. Id. at 158:4-12.

Kroninger failed to meet many of her sales goals, for both goal attainment and activations, for FY06 Q2 (September-November 2005). Suhoza Declaration ¶ 23.

In September and October 2005, Suhoza and Marchetti held "2-on-1" business reviews with each of the AEs. The purpose of the reviews was to examine each AE's prior, current and future performance. Marchetti Declaration at ¶ 43. On October 4, 2005, Marchetti and Suhoza met with Kroninger to discuss information provided to them by Kroninger showing that she had not met the expected goal of 100% or greater Goal Attainment for Primary accounts for FY05 Q2, Q3, Q4, or FY06 Q1. Marchetti Declaration at

Findings and Recommendation Page 16

¶ 44; Suhoza Declaration ¶ 19. Kroninger's six month Activations trend demonstrated that for the preceding six months, she had not hit her Primary goal of $300 ADNR at all (her closest month was $133.86) and only hit her Secondary goal of $100 ADNR once. Marchetti Declaration at ¶ 44, Exhibit G. According to Marchetti and Suhoza, Kroninger was upset during the meeting and made a comment that she was surprised "we had not fired her already because of her numbers." Marchetti Declaration at ¶ 45; Suhoza Declaration ¶ 19.

Suhoza and Marchetti decided to issue Kroninger a Letter of Warning. Marchetti Declaration at ¶ 46; Suhoza Declaration ¶ 21. On October 6, 2005, Marchetti met with Kroninger to issue the Letter of Warning. Marchetti Declaration at ¶ 48, Exhibit I. Marchetti required Kroninger to submit an action plan each Friday. Id. at ¶ 48. Between September and October 2005, Marchetti issued Letters of Warning to four other AEs who had previously received Letters of Counseling: Chris Forzano, Lori Thurston, Brad McLafferty, and Bryan Mikota. Id. at ¶ 49; Suhoza Declaration ¶ 21 and Exhibit F. Kroninger has testified that she does not dispute the statements made in the letter. Kroninger dep. 72:1-16; 89:1-90:21.

Suhoza states in his declaration that at the time he and Marchetti decided to issue the Letter of Warning to Kroninger, he had no knowledge of any alleged sexual harassment by Marchetti toward Kroninger. Suhoza Declaration ¶ 22. According to Suhoza, Marchetti had never said or done anything to indicate that she was upset with Kroninger or harbored any animus, dislike or anger

Findings and Recommendation Page 17

toward her. Id. To the contrary, "from my general observations and discussions with Ms. Marchetti, it appeared that she liked Ms. Kroninger as an employee and wanted to see her sales performance improve so that she could be a successful Account Executive and member of the Mt. Hood team." Id.

Kroninger testified that in about the middle of October 2005, she recounted the events of September 28, 2005, to Bornac. Kroninger dep. 273:19-274:20.

In November 2005, Bornac told Marchetti that Kroninger had told her Marchetti had spent the night at the Kroningers' house, gotten into the hot tub with them, and tried to kiss Kroninger. Marchetti dep. 186:3-22. Marchetti testified that she was "shocked" that Kroninger would "create" such a story, but did not tell anyone about what Bornac had said except her partner, id. at 187:20-188:25, who was at that time a senior manager for FedEx Express. Id. at 189:11-15.

On December 15, 2005, Kroninger sent an email to Marchetti and Joan Helms, saying she would be having sinus surgery on December 27, with a recovery period of approximately two weeks, and wanted to know what her sick pay benefits were and what documentation she needed to provide. Kroninger dep. 306:21-307:6, Exhibit A, p. 98. Kroninger asked that she be given sick leave for December 27, 28, 29, 30, 2005, and January 3, 2006. Kroninger dep. 313:13-20. She asked for vacation days January 4, 5, 6, 9 and 10. Id. at 313:23-314:1. See also id. at Exhibit A, p. 101.

///

Kroninger testified that when Marchetti learned about Kroninger's upcoming surgery, she "told me not to worry about" talking to Joan Helms, that Marchetti would "take care of it." Id. at 307:24-308:2. The next day, Marchetti sent Kroninger an email saying, "Girl I will help you with this." Id. at 308:9-13 and id. at Exhibit A, p. 99. Kroninger did not consider this use of "girl" derogatory. Id. at 308:21-23. Kroninger wrote back to Marchetti, "I am scared. Will you and Candy [Bornac] come visit me?" Id. at 309:2-7. On December 22, Kroninger sent an email to Bornac and Marchetti telling them her surgery was on December 27, giving them John Kroninger's telephone number, and wishing them a Merry Christmas. Id. at Exhibit A, p. 100.

On December 26, 2005, Marchetti sent Kroninger an email saying, "It will all work out!!! I will call John tomorrow! I will be thinking about you. Let us know when we can see you." Id. at Exhibit A, p. 101. Marchetti admitted at her deposition that she did not tell Kroninger her leave was protected under OFLA or FMLA. Marchetti dep. 203:13-16. While Kroninger was on leave, she went out to lunch with Bornac and Marchetti. Kroninger dep. 309:23-310:1.

Kroninger failed to meet many of her sales goals for both goal attainment and activations in December 2005 and January 2006. Suhoza Declaration at ¶ 23.

Kroninger returned to work on January 9, 2006, and did not request any additional medical leave in January. CSF ¶ 16. On January 18, 2006, Kroninger wrote an email to her former

supervisor, Mohammed Ali, saying, "I was supposed to be off until 1/16 but I came back last week. I was feeling good enough to start back. Also, I was getting a little bored ... you can only watch so many movies, tv and read books." Kroninger dep. Exhibit A, p. 102.

Kroninger suffered no adverse employment consequences for her leave except that it counted against her available sick and vacation days. Id.

Suhoza states in his declaration that on February 2, 2006, he and Marchetti were traveling between Hood River and Portland after a sales call, and agreed Marchetti would talk to Kroninger about voluntary resignation. Suhoza Declaration ¶ 24. Marchetti subsequently informed Suhoza that she had spoken with Kroninger on February 3, and that Kroninger was not interested in resigning. Suhoza Declaration ¶ 25. Suhoza states that on the basis of Kroninger's performance failures, despite having been in a formal mentoring relationship with a successful Corporate AE, Shannon Fyre, for over a year, he and Marchetti decided, sometime before the morning of February 10, 2006, to terminate Kroninger. Id. On February 10, Suhoza asked Marchetti to try to set up a conference call with Kroninger to discuss the possibility of resignation. Id. at ¶ 26.

Sometime between February 2, 2006, and February 9, 2006, Kathie Walthall, an HR advisor, received a phone call from Marchetti, telling her that Kroninger had previously received letters of counseling and warning for failing to meet certain sales goals, and saying that she and Suhoza had decided to terminate

Findings and Recommendation Page 20

Kroninger's employment. Walthall Declaration ¶ 4. Walthall told her she would need to submit a "Request for Termination" form for Walthall's review. Id. When a Request for Termination is submitted, Walthall reviews FedEx policies and procedures to ensure that they have been met and that the employee is being treated in the same manner as other similarly situated employees. If Walthall found that the termination was consistent with FedEx policies and procedures, she concurred in the decision and informed the manager of her concurrence. Id. at ¶ 5.

In the late morning of February 10, 2006, Suhoza received a fax from Dr. Paul Kaplan, who identified himself as Kroninger's doctor. Suhoza Declaration at ¶ 27. In the fax, Dr. Kaplan said Kroninger was recovering from sinus surgery and that she would not be at "full force" in the workplace for up to three months. He did not indicate whether Kroninger needed to be off work completely, or what he meant by "full force." Id. Suhoza states that this was the first time he had been informed that Kroninger had had sinus surgery in December 2005, and that he did not recall being told Kroninger had requested or taken medical leave before receiving the fax from Dr. Kaplan. Id. at ¶ 28.

Suhoza states that at 11:24 a.m. on February 10, 2006, Marchetti sent him an email advising Suhoza that she had received Dr. Kaplan's fax and stating that she was "not sure if this throws a wrench in anything," referring to Kroninger's termination. Id. at ¶ 29. That same day, Suhoza replied that the fax did not change anything, and that the termination was about the last three or more

years of performance. _Id._ See also Exhibit H (email from Marchetti and Suhoza's response).

On February 11, 2006, Marchetti emailed to Suhoza a draft of a Request for Termination form for Kroninger, asking him to review it. Suhoza Declaration ¶ 30, Exhibit I. The draft outlined the last three PPEs, disciplinary chronology, management's position, demographics, comparables, a recommendation, and a list of similarities with other terminations in the area. _Id._ at Exhibit I. Suhoza made no changes to the draft. Suhoza Declaration ¶ 30.

On February 13, 2006, at 11:35 a.m., Suhoza and Marchetti submitted Requests for Termination of Kroninger to Walthall. Walthall Declaration at ¶ 6, Exhibit A. Minutes later, at 11:48 a.m., Walthall received an email from Kroninger to Suhoza, copied to Marchetti and Walthall, thanking Suhoza for suggesting short term disability (STD) to her on February 10, 2006, and asking Walthall how to apply for STD leave. _Id._ at ¶ 7, Exhibit C.

Suhoza states in his declaration that he emailed Kroninger on February 13 to clarify that, in their discussion of February 10, he "did not and would not suggest going out on STD to any employee." Suhoza Declaration Exhibit K.

A day or two after February 13, 2006, Suhoza spoke to Cocuzzo, who concurred in the decision to terminate Kroninger. Suhoza Declaration ¶ 34.

Walthall did not initially concur with the request for Kroninger's termination, because Lori Thurston, who had received letters of warning and counseling at the same time as Kroninger,

Findings and Recommendation Page 22

was given a second letter of warning rather than being terminated. Walthall Declaration, ¶ 9. However, after a conversation with, and an email from, Suhoza on February 24, 2006, Walthall was persuaded that Kroninger's situation was more similar to that of Mike Cummings, a previously terminated employee who had received a rating of "Needs Improvement" on his last PPE and had received only one letter of warning. Id. Suhoza pointed out that Kroninger's situation was different from Thurston's because Kroninger's history of non-performance was significantly longer than Thurston's, and Thurston had received an "Exceeds Expectations" on her last performance review. Id. at ¶ 11. Walthall therefore concurred in the decision to terminate Kroninger. Id. at ¶ 12.

Cocuzzo was copied on the February 24, 2006, email that Suhoza sent to Walthall, Suhoza Declaration ¶ 8, Exhibit B, and agreed that Kroninger's circumstances were more like Cummings's than Thurston's. Cocuzzo Declaration ¶ 9. Cocuzzo states that Suhoza's February 24, 2006, email "did not cause me to change my opinion on whether Ms. Kroninger's termination was proper," but rather "only confirmed that termination was warranted." Id. Walthall discussed Kroninger's termination with her supervisor, Jean Miller, and Miller concurred in Kroninger's termination. Walthall Declaration ¶ 13.

Walthall was not responsible for handling Kroninger's STD benefits. They were handled by Debbie Miller, an HR manager for the Mt. Hood District. Id. at ¶ 14.

///

Findings and Recommendation Page 23

Kroninger was absent for five days beginning on February 13, 2006, and then went out on STD about February 20, 2006. Defendants' CSF ¶ 18; Walthall Declaration ¶ 14. Because she was on STD leave at the time Miller and Walthall concurred in the decision to terminate her, Miller and Walthall decided her termination should be postponed until she returned from leave. Walthall Declaration ¶ 13.

On February 24, 2006, Robin Labaw called the FedEx Alert Line. Labaw dep. 107:17-23. Labaw testified that she told the person who answered the phone that she had observed Marchetti sexually harassing Kroninger. Id. at 108:1-10. The case report of the call reads, in part:

> Caller states on September 29, 2005 [sic] caller observed Jennafer Marchetti sexually harassing Rebecca Kroninger. Caller states Jennafer had been drinking and told Rebecca that Jennafer loved Rebecca. Caller states Jennafer was drinking and told caller that they weren't going to do the work that they were supposed to do and that they were only going to party. Caller states caller learned of the rest of the information contained here through Rebecca. Caller states on 9/25/05, Jennafer tried several times to have sex with Rebecca. Caller states Rebecca was the designated driver. Caller states Jennafer was too drunk to drive and slept on the couch at Rebecca's house. Caller states Jennafer called Rebecca and apologized. Caller states a week later, Rebecca had a warning letter in Rebecca's file. ... Caller believes the warning letter was retaliation. ... Caller states Jennafer did not help Rebecca fix the problems in the warning letter. ... Caller states other employees have told caller about Jennafer verbally abusing employees. ... Caller states Jennafer regularly refers to her employees as jackasses or other disrespectful nicknames. Caller states no one would report these issues because they are in fear of losing their jobs.

Walthall Declaration Exhibit E. On February 27, 2006, Walthall was notified that an anonymous complaint had been made via the Alert

Findings and Recommendation Page 24

Line about Marchetti. Supplemental Declaration of Kathie Walthall ¶ 3. At that time, she did not know who made the complaint, and did not know who else was involved. Id. She did not know the complaint involved Kroninger until she received a copy of the Alert Line Case Report on March 1, 2006. Id.  Walthall commenced an investigation.

On March 14, 2006, Kroninger submitted a statement answering questions posed to her by Walthall. Walthall Declaration Exhibit I. Kroninger made the allegations about Marchetti's saying curly hair would look good on her; the June 2005 incident in which Marchetti made comments about Kroninger's girl friend and about having long fingers; the July 2005 comment about Marchetti, Bornac and Kroninger going out together; the August 2005 reference to showering at Marchetti's house and telling Kroninger she was awesome; and the incident of September 28, 2005. Id. In response to a question about why Kroninger had not reported any of these incidents to management, she responded, "I was afraid of losing my job. Also, I was embarrassed and felt humiliated that my manager would disrespect me in this manner." Id. Kroninger also stated that Suhoza "intimidates and scares me," that he was "really intense and makes me uncomfortable, and "[i]f you disagree with him forget it." Id. Kroninger said Bornac had "known about what's been going on for months," but Kroninger also suspected "an inappropriate relationship between Candy [Bornac] and Jennafer [Marchetti]." Id.

On March 17, 2006, Marchetti submitted a statement responding to questions posed by Walthall, denying that she ever had drinks with Kroninger at any time after December 2005; denying that she

Findings and Recommendation Page 25

had ever slept at Kroninger's house; denying that she had ever told Kroninger that she loved her or tried to have sex with her; denying telling Kroninger she had long fingers; denying that she told John Kroninger she had a crush on his wife; denying being in a hot tub with the Kroningers, and denying trying to kiss Kroninger or telling her she was a bitch and a tease, although Marchetti did admit having a "potty mouth" and sometimes calling people jackasses as a joke. Walthall Declaration, Exhibit F.

Walthall also interviewed Bornac and Labaw, and they submitted statements dated March 16, 2006, and March 17, 2006, respectively. Walthall Declaration Exhibits K and L. Labaw stated that when Marchetti came to Kroninger's house on September 28, 2005, Labaw could smell the alcohol on her breath. Exhibit K. She said Marchetti closed Labaw's laptop and said they were going to party, and that Kroninger then brought a videotape of herself singing at a United Way telethon. Id. Labaw then left, but stated that the next day Kroninger told her Marchetti had gotten drunk and spent the night. According to Labaw, Kroninger subsequently provided Labaw more details about the September 28, 2005 episode telling her Marchetti told Kroninger she loved her, told Kroninger's husband that she had a huge crush on her, and made advances in the hot tub. Id. Labaw said "My understanding is there have been other incidents. Not sure what they were, but I know they happened prior to this incident." Id.

Bornac stated that she did not go to Kroninger's house on September 28, 2005, but that Kroninger told her Marchetti had

Findings and Recommendation Page 26

"tried to put the moves on her." Exhibit L. According to Bornac,

> Rebecca [Kroninger] tends to think that everyone is
> attracted to her--this may or may not be true--I do not
> see it. She thinks that her male customers and Chris
> Suhoza have tried to look down her blouse-she has said
> more than once that she "has her Boom Boom going on"--
> that she just has something about her that draws men to
> her--she believes herself to be extremely sexy and men
> and women alike see it--she told me her husband has even
> agreed with her on this topic. At a meeting Chris Suhoza
> came over to speak to us and after he left, Rebecca
> stated that he tried to look down her blouse. Laughingly
> I told her that he was not. I just thought she was being
> funny.

Id. Bornac said that when Kroninger told her Marchetti had tried to

put the moves on her, she told Kroninger that she found it

"unreal," because she had

> never seen anything like this in Jennafer's [Marchetti's]
> actions. Jennafer is very touchy-feely. She is warm and
> caring to her team and to customers as well. She has
> never done anything inappropriate or out of line that I
> viewed or was honestly aware of.

Id. Bornac said that when she told Marchetti what Kroninger had

said about the September 28 episode, Marchetti was "saddened--and

aghast. Jennafer told me that this story was false." Id. Asked

whether she had ever told Kroninger that Marchetti was in love with

her, Bornac responded,

> We have joked that I am Jennafer's [Marchetti's] favorite
> at work and Rebecca [Kroninger] responded, "Yes, but I am
> the one she wants," and I may have said oh yeah she loves
> you. You have to understand the context--just joking--we
> all do this with Jennafer--saying we are vying to be her
> favorite.

Id. On March 20, 2006, Walthall made a report to management about

the Alert Line allegations. Walthall Declaration Exhibit M.

Walthall's conclusion was that the

Findings and Recommendation Page 27

incidents described in the anonymous complaint could not be substantiated. The witnesses did not have first-hand knowledge. They were only able to discuss what had been told to them. None have witnessed any inappropriate behavior by Jennafer Marchetti. Jennafer Marchetti did admit that she has a potty mouth and has used the term jackass but not in a derogatory manner.

Id. Walthall recommended that Marchetti receive counseling on not using inappropriate language and that although touching employees was not inappropriate, "Jennafer may need to assess its use in the workplace." Id.

Kroninger returned to work from STD on a part-time temporary status about March 7, 2006 and returned to full-time work about March 16, 2006. Defendants' CSF ¶ 21. Pursuant to FedEx policy about complaints or discrimination or harassment, her termination was suspended until the Alert Line investigation was completed. Id.

On March 24, 2006, the Alert Line investigation was completed. Withall Declaration ¶ 29. That same day, Walthall received an email from Kroninger asking to be transferred to a different job at another FedEx company, beginning June 1, 2006. Id. at Exhibit N. On March 29, 2006, Walthall sent an email to Marchetti requesting updates about Kroninger's performance since the February 10, 2006 Request for Termination. Walthall Declaration ¶ 30 and Exhibit O. Walthall states in her declaration that since Kroninger was no longer on leave, and the investigation had concluded with a finding that Kroninger's allegations could not be substantiated, "there was no longer any reason to postpone the decision to terminate Ms. Kroninger's employment that was initiated in February 2006." Walthall Declaration ¶ 30. Marchetti wrote back, "I will provide

Findings and Recommendation Page 28

you with an updated termination request this afternoon. Does this mean that the alert line allegation has been dismissed?" Marchetti dep. Exhibit 22.

On March 29, 2006, Kroninger sent an email to Walthall saying she was "becoming more and more uncomfortable as this situation goes on," and asking for an acknowledgment of her request for transfer and the current status of her complaint. Walthall Declaration Exhibit Q. Walthall responded on March 30, 2006, telling her the status of the complaint "is answered via the Alert Line;" informing Kroninger that transfers between FedEx operating companies could not be done and that Kroninger should apply for the position she wanted; and asking Kroninger, "What has happen [sic] that you are uncomfortable since the last time we spoke?" Id. On March 31, Kroninger responded that she would "contact you next week about my concerns," but did not answer the question about what had made her comfortable. Id. Kroninger never provided Walthall any additional information about being uncomfortable. Walthall Declaration ¶ 31.

On March 31, 2006, Marchetti sent an updated Request for Termination to Walthall. Walthall Declaration ¶ 32 and Exhibit R. Kroninger's employment was terminated on April 14, 2006. Defendants' CSF ¶ 23.

Kroninger did not grieve her termination through FedEx's two levels of management review, as she was entitled to do. Walthall Declaration ¶ 34. On September 19, 2006, Kroninger filed an administrative complaint with BOLI.

Findings and Recommendation Page 29

1

**Standards**

2      A party is entitled to summary judgment if the "pleadings,

3  depositions, answers to interrogatories, and admissions on file,

4  together with affidavits, if any, show there is no genuine issue as

5  to any material fact." Fed. R. Civ. P. 56(c). Summary judgment is

6  not proper if material factual issues exist for trial. Warren v.

7  City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). A genuine

8  dispute arises "if the evidence is such that a reasonable jury

9  could return a verdict for the nonmoving party." State of

10  California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003). Where

11  the record taken as a whole could not lead a rational trier of fact

12  to find for the non-moving party, there is no genuine issue for

13  trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

14  574, 587 (1986).

15      On a motion for summary judgment, the court must view the

16  evidence in the light most favorable to the non-movant and must

17  draw all reasonable inferences in the non-movant's favor. Clicks

18  Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir.

19  2001). The court may not make credibility determinations or weigh

20  the evidence. Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-55

21  (1990). "Credibility determinations, the weighing of the evidence,

22  and the drawing of legitimate inferences from the facts are jury

23  functions, not those of a judge." Reeves v. Sanderson Plumbing

24  Products, Inc., 530 U.S. 133, 150 (2000). Where different ultimate

25  inferences may be drawn, summary judgment is inappropriate.

26  Sankovich v. Ins. Co. of N. Am., 638 F.2d 136, 140 (9th Cir. 1981).

27

28

**Discussion**

1.    <u>Sexual harassment claims and Ellerth affirmative defense</u>

Although Kroninger alleged quid pro quo sexual harassment in her Amended Complaint, she has not proffered evidence supporting such a claim. She admits in her testimony that Marchetti never made promises or threats contingent upon Kroninger's submission to Marchetti's advances. The court therefore construes the sexual harassment claims as based on hostile environment.

FedEx asserts that the sexual harassment claims under Title VII and state law fail because FedEx has established the affirmative defense to liability articulated by the Supreme Court in <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1988). There the Court held that an employer is vicariously liable for sexual harassment by a supervisor that results in a "tangible employment action," such as discharge, demotion, or undesirable reassignment. 524 U.S. at 765. If the supervisor's harassment culminates in a tangible employment action, the defense is not available to the employer. If it does not, the employer can raise an affirmative defense that consists of two elements: first, that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and second, that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. <u>Id.</u> The same standard applies to a harassment claim under Oregon law. <u>Jernigan v. Alderwoods Group, Inc.</u>, 489 F. Supp.2d 1180, 1194 n. 6 (D. Or. 2007).

1    a.    Tangible employment action

2        A tangible employment action is "a significant change in
3    employment status, such as hiring, firing, failing to promote,
4    reassignment with significantly different responsibilities, or a
5    decision causing a significant change in benefits." Ellerth, 524
6    U.S. at 761. In most cases, a tangible employment action "inflicts
7    direct economic harm." Id. at 761-62. The tangible employment
8    action must be the result of a supervisor's harassment. Id. at 765.
9    See also Kohler, 244 F.3d at 1179 (even when employer conduct
10   constitutes tangible employment action, to survive summary
11   judgment, plaintiff must still point to disputed facts showing that
12   her rejection of harasser's advances caused the employment
13   actions).

14       FedEx asserts that Kroninger cannot establish that the Letter
15   of Counseling or the Letter of Warning constitute tangible
16   employment actions, because they are not of the same magnitude as
17   hiring, firing, promoting or reassigning, and there is no evidence
18   that the issuance of either letter resulted in any economic harm to
19   Kroninger or caused any other significant change in her employment
20   status, title or duties. FedEx cites Hardage v. CBS Broadcasting
21   Inc., 427 F.3d 1177, 1183 (9th Cir. 2005), amended, 433 F.3d 672,
22   436 F.3d 1050 (9th Cir. 2006)(adverse performance memoranda,
23   including one placing employee on 30 day probationary period and
24   referencing possible termination, not tangible employment actions)
25   and Kohler v. Inter-Tel Tech., 244 F.3d 1167, 1179 (9th Cir.
26   2001)(holding it was "questionable" whether employee suffered a

27

28   Findings and Recommendation Page 32

tangible employment action because harasser acted angrily toward her, withheld training and assistance, and gave her inconvenient work schedules and a poor performance review; none of the harasser's actions appeared to have caused a "significant change in employment status," quoting Ellerth, 524 U.S. at 761).

Kroninger concedes that the Letter of Counseling and the Letter of Warning are not tangible employment actions, but asserts that her termination was, and that she has generated a fact issue on whether her termination was the result of Marchetti's sexual advances and Kroninger's rejection of them.

Kroninger asserts that the following is circumstantial evidence that her termination was the result of Marchetti's harassment and her own resistance: 1) Marchetti was one of the people who decided to terminate her, and in fact initiated the termination; 2) at the time Marchetti initiated the decision to terminate Kroninger, Marchetti knew of Kroninger's allegations because Bornac had told her about them; and 3) while Kroninger may not have met performance expectations, Kroninger was never in the bottom 20% of the Leader Board, and it was "widely known" that FedEx had a policy that AEs' jobs were safe so long as they were not in the bottom 20% of the quarterly Leader Board rankings.

(1)   Timing

A rational jury could find that the timing of Kroninger's termination suggests a causal link with the alleged harassment or resistance to the harassment. Kroninger was terminated April 14, 2006, about seven months after the alleged assault on September 28,

Findings and Recommendation Page 33

2005 (the only instance, by Kroninger's testimony, of resistance to a sexual advance from Marchetti.) However, the termination was delayed for several months by the Alert Line investigation and by Kroninger's medical and STD leave.

The preliminary steps for her termination (the June 5, 2005 PPE with a rating of "Needs Improvement," the Letter of Counseling, dated July 6, 2005, and the PPE for FY06 Q1 with a rating of "Needs Improvement" (September 28, 2005) had occurred before the alleged harassment on September 28, 2005. In addition, Kroninger was among six AEs who received a Letter of Counseling at about the same time, for the same performance issues. On the other hand, a reasonable argument could be made that these preliminary steps were occasioned by Marchetti's determination to force Kroninger into compliance with her sexual demands.

(2)    Knowledge

There is evidence that by November 2005, Marchetti knew Kroninger had complained to Bornac about the events of September 28, 2005. This was before February 2006, the month in which Suhoza and Marchetti began discussing Kroninger's resignation (February 2, 2006), Marchetti spoke to Kroninger about resignation (February 3, 2006), the decision by Suhoza and Marchetti to terminate Kroninger (by February 9, 2006), and Labaw's anonymous call to the Alert Line (February 24, 2006). Suhoza has testified that at the time of the termination decision, he was not aware of the alleged harassment, Suhoza Declaration ¶ 41, and there is no evidence that Walthall knew of it, but the other decisionmaker, Marchetti, did know that

Kroninger had complained about her to Bornac, and had initiated the termination request.

(3)  Intervening causes for Kroninger's termination

It is undisputed that Kroninger's failure to meet her performance goals extended at least from FY05 Q1 through FY06 Q1. She was terminated in FY06 Q3.

(4)  Same treatment to others

It is undisputed that five other AEs in the Mt. Hood district received Letters of Counseling for the same failures to meet performance goals as Kroninger, and at the same time she did. It is also undisputed that of the five other AEs, four received Letters of Warning for the same failures as Kroninger and at the same time. There is no evidence that Kroninger's PPEs and Letters of Counseling and Warning were undeserved or that she was singled out. The PPEs and the letters were not based on subjective judgments alone, but on sales numbers over several quarters that Kroninger has not challenged. On the other hand, a reasonable jury could find that Kroninger's reassignment from a downtown Portland territory to a territory covering McMinnville, Newberg, and Yamhill County in June 2005, the reason for which FedEx has not explained, could have made it more difficult for Kroninger to achieve performance expectations.

Further, FedEx acknowledges that the other AEs who got letters of counseling and warning were not terminated. FedEx has introduced evidence from Marchetti's deposition that the others were not similarly situated to Kroninger because 1) the others were all new

Findings and Recommendation  Page 35

AEs in FY05 and FY06; 2) Kroninger was the only one who got a "Needs Improvement" rating on her PPEs and 3) their failures to meet performance goals were not as protracted. Nevertheless, a rational jury could conclude that the "Needs Improvement" ratings assessed by Marchetti on Kroninger's PPEs were occasioned by Kroninger's alleged resistance to Marchetti's advances, not to differences in Kroninger's failures to meet performance goals from other employees' failures.

(5) Motive

Kroninger asserts that Marchetti "manipulated the decision to terminate Plaintiff and convinced Mr. Suhoza to do [so] as well." Plaintiff's brief, p. 6. As FedEx points out, Kroninger has offered no direct evidence of manipulation on the part of Marchetti. FedEx argues that there is no evidence Suhoza had not already reached the decision to ask Kroninger to resign or to terminate her prior to discussing it with Marchetti, or that he initially disagreed with termination until Marchetti convinced him otherwise, or that Marchetti provided him with false or misleading facts upon which to base his decision. There is no evidence to prove or disprove this argument. Suhoza states in his declaration that he based his decision to terminate Kroninger on performance factors over an extended period of time. Suhoza Declaration ¶¶ 25, 45. Suhoza also states that at the time of his decision to terminate Kroninger, Marchetti had never done or said anything to him that indicated she was personally upset with Kroninger or harbored animus against her. Suhoza Declaration ¶ 41. However, these statements do not

Findings and Recommendation Page 36

necessarily preclude a finding by a jury that Marchetti wanted Kroninger terminated because Kroninger had refused Marchetti's sexual advances, and had discussed these advances with other employees. Suhoza and Marchetti's first discussions about terminating Kroninger occurred two to three months after Marchetti learned that Kroninger had talked to other employees about the September 28 episode. There is nothing in the record to suggest that Marchetti took any action to deal with a story that, according to Bornac's statement, left Marchetti aghast.

There is no evidence that Walthall, who was also involved in the decision to terminate Kroninger, had a motive to terminate Kroninger for any reason other than performance issues. On the other hand, Walthall had to be persuaded that Kroninger's termination was justified. Further, Walthall's conclusion after the Alert Line investigation that the complaint could not be substantiated because the witnesses did not have first-hand knowledge was inaccurate. Labaw did have first hand knowledge that Marchetti had been drinking when she arrived at Kroninger's house on September 28, 2005, and that Marchetti had closed Labaw's laptop and said they were going to party. Nor is there an explanation of why Walthall refused, on March 30, 2006, to answer a question from Kroninger about the status of her complaint, but had at least implicitly answered Marchetti's question on that subject, "Does this mean that the alert line allegation has been dismissed?" on March 29, 2006, by asking Marchetti for updates on Kroninger's performance.

(6)   Pretext

Kroninger asserts that it was an "unspoken rule" at FedEx that as long as an AE stayed out of the bottom 20 percent on the Leader Board,[1] his or her job was not in danger. Kroninger dep. 353:6-16. In her brief, Kroninger contends that it was "widely known" that Marchetti implemented this unspoken rule, as well as Cocuzzo, and "it was told to everyone that was the way it should be." Id. at 33:17-18. See also 481:17. But Kroninger's testimony about what Cocuzzo actually said about the bottom 20% does not support her understanding that her job was safe so long as she stayed out of it. She testified that Cocuzzo said only that "the people in the top 20 percent were rewarded, and the people in the bottom 20 percent were obviously not rewarded." Kroninger dep. at 26:16-25. Moreover, Bornac testified that she did not recall a meeting in which Cocuzzo talked about the importance of not being in the bottom 20 percent. Bornac dep. 24:6-9.

There is no evidence from Kroninger that FedEx, through management or through a company policy or procedure, ever informed employees that their jobs would be secure so long as they stayed

---

[1] The Leader Board was a recognition program that ranks each AE in a region, based on a weighted formula involving various components of their sales performance for one or more quarters. Declaration of Richard Cocuzzo ¶ 4. The primary purpose of the Leader Board is to enable AEs to compare their performance in relation to their peers in the district and throughout the region. Id. According to Cocuzzo, AEs are not held accountable for where they rank on a particular Leader Board; rather, their performance is measured by whether or not they meet the Performance Expectations in their PPE form. Id. at ¶ 5. This is in part because the Leader Board reflects *past* sales numbers rather than numbers for the month it is published. Id.

out of the bottom 20% of the Leader Board. Kroninger herself testified that she did not remember Suhoza or Marchetti ever discussing the importance of not being in the bottom 20%. Kroninger dep. 471:3-7; 481:6-17.

The deposition testimony of Candace Bornac, which Kroninger cites in support of this argument, also does not support Kroninger's statement that this "unspoken" rule "was something among the AEs that we discussed." Kroninger dep. 471:6-7. Bornac testified that there was a definite expectation at FedEx that AEs not be in the bottom 20% on the Leader Board, because it meant the AE was not achieving expectations. According to Bornac, a manager would be "remiss if she didn't try and get everyone out of the bottom 20 percent." Bornac dep. 23:16-24:21. Bornac did not testify that an AE's job was safe so long as he or she was not in the bottom 20%. In fact, Bornac testified that she would not agree" with the statement that there was an understanding at FedEx that an AE's job was safe so long as she was not in the bottom 20%, because "[t]here is a lot of different measurements that go into your standing as a salesperson, and just because you are not in the bottom 20 percent doesn't ensure that you are going to keep your job." Bornac dep. 26:2-9.

Neither the Letter of Counseling, the Letter of Warning, nor any of Kroninger's PPEs makes a reference to being or not being in the bottom 20%. And finally, Kroninger's argument is undermined by evidence that the AEs who got Letters of Counseling and Letters of

Warning were at various places on the Leader Board.[2]

Rich Cocuzzo has submitted a declaration in which he states that in his tenure as Vice President of Sales, he is not aware of a single AE in any of the five regions he supervised who was disciplined or terminated simply because he or she ranked in the bottom 20% on a Leader Board. Cocuzzo Declaration ¶ 6. According to Cocuzzo, AEs who fail to meet their PPE Performance Expectations may be disciplined or terminated regardless of where they rank on a particular Leader Board; conversely, an AE who meets expectations is not disciplined or terminated even when they are in the bottom 20% of a particular Leader Board. Id. Suhoza makes the same statements with respect to the AEs he supervised. Suhoza Declaration ¶¶ 5-8.

The evidence indicates that only Kroninger and Mike Cummings were terminated for performance issues. Cummings appears in the bottom 20% of the Leader Board ranking for the fall of 2005.

---

[2] For example, the Fall 2005 Leader Board shows Kroninger in the top 20%, Brad McLafferty, Bryan Mikota, and Lori Thurston in the middle 60% and Candace Bornac and Christopher Forzano in the bottom 20%. The Leader Board for Winter 2005 shows Lori Thurston, Kroninger, and Brad McLafferty in the middle 60% and Christopher Forzano and Candace Bornac in the bottom 20%. The Leader Board for Spring 2005 shows Bryan Mikota in the top 20%, Lori Thurston, Kroninger, and Brad McLafferty in the middle 60%, and Candace Bornac and Christopher Forzano in the bottom 20%. The Summer 2005 Leader Board shows Bryan Mikota in the top 20%, Lori Thurston, Candace Bornac, Brad McLafferty, and Kroninger in the middle 60%, and Christopher Forzano in the bottom 20%. Marchetti Declaration, Exhibit C. Forzano resigned in October 2005. Supplemental Marchetti Declaration ¶ 8. I note that one of the AEs who received a Letter of Counseling and a Letter of Warning along with Kroninger, Bryan Mikota, was in the top 20% on the Leader Board for Spring 2005 and Summer 2005, and was never in the bottom 20%.

Findings and Recommendation Page 40

Kroninger does not appear in the bottom 20% in any Leader Board ranking. I conclude that in the absence of evidence from FedEx that AEs who were never in the bottom 20% of the Leader Board still got terminated, Kroninger's subjective opinion of FedEx's policy, and Bornac's comment that being in the bottom 20% on the Leader Board meant the AE was not achieving expectations, are sufficient to create an issue of fact.

I conclude that issues of fact on the question of whether Kroninger's termination was the result of sexual harassment or resistance to harassment precludes FedEx from invoking the Ellerth defense.

2.   Retaliation claims

   a.   Time bar

FedEx asserts that Kroninger's claim that she was retaliated against for refusing Marchetti's sexual advances must fail because it is time-barred and because refusing sexual advances does not constitute "protected activity" under Title VII. Kroninger concedes this argument, and withdraws language in paragraphs 52 and 57 of the Amended Complaint alleging that she was retaliated against for "refusal of Defendant Marchetti's sexual advances."

However, Kroninger asserts that she still has a retaliation claim based on her participation in the February 2006 Alert Line investigation. FedEx responds that the retaliation claim based on participation in the investigation founders on the causation element of her prima facie case.

   b.   Prima facie case

Findings and Recommendation Page 41

To establish a prima facie retaliation claim, a plaintiff is required to show 1) involvement in a protected activity; 2) an adverse employment action taken against the plaintiff; and 3) a causal link between the two. See, e.g., Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir. 2002). FedEx challenges Kroninger's prima facie case.

To survive summary judgment on the causation element, Kroninger must create a question of fact on whether engaging in the protected activity was one of the reasons for her termination and that, but for such activity, she would not have been terminated. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064-65 (9th Cir. 2002).

FedEx asserts that Kroninger cannot establish a causal connection between her participation in the Alert Line investigation and her termination because Marchetti and Suhoza made the decision to terminate her and started on the termination process at least two weeks before the Alert Line call was made and about one month before Kroninger's involvement in the Alert Line investigation, which began on March 10, 2006.

FedEx relies on two cases finding no causation where the decision to terminate is made before a discrimination complaint, but the termination occurs afterward. The cases are Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001), and Barnowe v. Kaiser Foundation Health Plan of the Northwest, 2005 WL 1113855 (D. Or. 2005). In Breeden, the employee filed a complaint, but it was not served on the employer until after the employer made a decision

to transfer the employee, but before the transfer occurred. In
Barnowe, it was undisputed that plaintiff did not make any
complaint of harassment or discrimination until five days after she
had been asked to resign. The court said:

> The Supreme Court has made clear with respect to
> retaliation claims that "[e]mployers need not suspend
> previously planned [employment actions] upon discovering
> that a Title VII has been filed, and their proceeding
> along lines previously contemplated, though not yet
> definitively determined, is no evidence whatever of
> causality. Clark County Sch. Dist. v. Breeden, 532 U.S.
> 268, 272 (2001)

Barnowe at *5. The court found the temporal proximity of the two
events did not demonstrate of causality. Id.

Kroninger acknowledges that Marchetti and Suhoza had made the
decision to terminate her before the Alert Line call or the Alert
Line investigation, but argues that a jury could, on the basis of
evidence that Walthall did not accept the Request for Termination
until after the Alert Line investigation was concluded, find that
"there was an insufficient performance-based reason to terminate
Plaintiff," and that a substantial or motivating reason for FedEx's
termination of Kroninger was her participation in the Alert Line
investigation. Kroninger asserts that Walthall's statement that she
had made up her mind to terminate Kroninger before learning of the
Alert Line report is "unsubstantiated and not worthy of credence."
Kroninger also asserts that she has "direct evidence of retaliaton"
in the form of Marchetti's response to Walthall's March 29, 2006
email request for an update on Kroninger's performance ("Does this
mean that the alert line allegation has been dismissed?") Kroninger
argues that this question from Marchetti demonstrates a direct

Findings and Recommendation Page 43

relation between Kroninger's employment status and the Alert Line investigation. She argues that in the light most favorable to her, this is "specific evidence of retaliation." Plaintiff's Brief p. 19.

I find these arguments persuasive, largely for the reasons stated above in the analysis of whether a rational jury could find that Kroninger's termination was the result of Marchetti's harassment or Kroninger's resistance to it. A rational jury could conclude that Marchetti, knowing Kroninger's employment was vulnerable because of performance problems, targeted Kroninger for unwelcome sexual advances. A rational jury could find that when the advances were resisted, and after learning that Kroninger had told other employees about the September 28 incident, Marchetti persuaded Suhoza and Walthall that Kroninger should be terminated for performance issues. A rational jury could also conclude that Marchetti targeted Kroninger because she knew that if Kroninger rebuffed her advances or made complaints to management, Kroninger could be disciplined or terminated for that protected activity under the pretext of the performance issues.

Kroninger has generated sufficient evidence to create a genuine issue of material fact on whether her participation in the Alert Line investigation was causally related to her termination, and that she has established a prima facie case of retaliation.

d.   Pretext

FedEx asserts that Kroninger has not carried her burden of showing that FedEx's proffered reasons for terminating her were

pretextual. FedEx contends that in the pretext analysis, the role of the court is not to question the wisdom of the employer's policies or whether the employer's actions were well-considered, but only to determine whether the employer had an honest belief in the reasons for its actions.

As discussed above, Kroninger's evidence generates a genuine issue of material fact on pretext. A rational jury could conclude, on the basis of Kroninger's prima facie case, that Marchetti targeted for her sexual advances female employees with performance problems, such as Kroninger, with the knowledge that if the targeted employee resisted in any manner, Marchetti could ensure that the employee was disciplined or even terminated for that resistance under the pretext of performance issues. Because a rational jury could find that the decision process for Kroninger's termination was tainted by this motive on the part of Marchetti, as well as Marchetti's knowledge that Kroninger had complained about sexual harassment to other employees, I conclude that Kroninger has generated an issue of fact on pretext.

I recommend that the motion for summary judgment on the retaliation claim be denied.

3.    <u>OFLA claim</u>

a.    OFLA notice requirement

Kroninger alleges that FedEx failed to give her proper notice of her OFLA rights when she requested leave in December 2005. Amended Complaint ¶¶ 68-69. FedEx moves against this claim on the ground that unlike FMLA, OFLA does not contain any requirement that

Findings and Recommendation Page 45

the employer provide an employee with specific notice of the right to take leave or other rights under under OFLA, except that the employer must post a notice of the requirements of OFLA in every worksite. Or. Rev. Stat. § 659A.180; OAR 839-009-0300. FedEx has produced evidence that the required notice, in a commercially available poster size, was posted in the employees' break room at the facility in Tualatin. Marchetti Declaration ¶ 5. Kroninger has not responded to this contention in her motion papers. I recommend, therefore, that this claim be dismissed.

b.   Prejudice

OFLA contains a provision that makes it an unlawful employment practice to "retaliate or discriminate" against an employee because the employee has inquired about OFLA, submitted a request for OFLA leave, or invoked any provision of the OFLA. Or. Rev. Stat. § 659A.183(2); OAR 839-009-0320(3).[3] Kroninger has alleged in her complaint that FedEx "discriminated and retaliated" against her by

---

[3] Or. Rev. Stat. § 659A.183 provides:

It is an unlawful practice for a covered employer to:

    (1)  Deny family leave to which an eligible employee is entitled...

    (2)  Retaliate or in any way discriminate against an individual with respect to hire or tenure or any other term or condition of employment because the individual has inquired about..., submitted a request for family leave or invoked any provision of ORS 659A.150 to 659A.186.

impermissibly using her absence from work while on medical leave and STD against her when assessing her sales performance. Kroninger contends that these facts support both an interference and a retaliation claim under OFLA.

A claim alleging that an employer visited negative consequences on an employee for using FMLA leave is covered under the FMLA provision governing "interference," 29 U.S.C. § 2615(a)(1). Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001). Under this provision, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by this subchapter." Thus, under FMLA, retaliation for taking medical leave is considered "interference" with the "exercise of rights" under FMLA, 29 U.S.C. § 2915(a)(1), rather than discrimination or retaliation for opposing a practice made unlawful under 29 U.S.C. § 2915(a)(2). Id. at 1125. The McDonnell Douglas burden-shifting framework for employment discrimination and retaliation claims is inapplicable to claims under § 2615(a)(1). Liu v. Amway Corp., 347 F.3d 1125, 1135 (9th Cir. 2003).

Whenever possible, OFLA claims are to be construed consistent with similar provisions of the FMLA. Or. Rev. Stat. § 659A.186(2); Steiner v. Tillamook County, 2007 WL 1412535 at *3 (D. Or. May 9, 2007). For this reason, and for ease of discussion, I construe Kroninger's OFLA claim as one for interference rather than retaliation, despite the use of the word "retaliate" in Or. Rev. Stat. § 659A.183.

Findings and Recommendation Page 47

A triable issue of fact exists in an OFLA interference case if the plaintiff shows that her taking of protected leave constituted a negative factor in the adverse decision made by the employer. Steiner at *3; see also Bachelder, 259 F.3d at 1125 (same).

FedEx asserts that Kroninger's interference claim must fail because she has not demonstrated that she was prejudiced by FedEx's consideration of her sales performance in December 2005 and January 2006. FedEx relies on an unpublished opinion from the Ninth Circuit, Walker v. T-Mobile USA, 2008 WL 4817093 at *1 (9th Cir. Nov. 5, 2008) and the opinion from this court in Stewart v. Sears, Roebuck and Co., 2005 WL 545359 at *11 (D. Or. Mar. 7, 2005). These cases, which deal with interference claims under FMLA, hold that a plaintiff must show she was prejudiced by the employer's alleged interference with her FMLA rights. See Stewart at *11 ["an actionable interference" in violation of FMLA exists when the plaintiff "is able to show prejudice as a result of that violation", quoting Conoshenti v. Public Serv. Elec. & Gas Co., 364 135, 144 (3d Cir. 2004)].

FedEx has proffered evidence that even if Kroninger's sales goals had been reduced on a pro rata basis to take into account her absences in December 2005 and January 2006 for the sinus surgery and/or her absence in February and March for STD leave, Kroninger still would not have met all of her Activations goals for these months and, for January, February and March 2006, would have failed to meet most of her goals. Marchetti Declaration ¶ 63. Marchetti has attached to her declaration a chart showing monthly Activations

goals and Kroninger's actual results for December 2005-March 2006. When Kroninger's goals are reduced by 20% (to reflect that she was absent for 20% of the working days in December and January 2005) and her actual results are compared to those reduced goals, she still would not have met her Secondary or Express goals for December 2005 or any of her goals in January 2006. Id. at ¶ 64. For February 2006, Kroninger's actual results are compared to a 60% reduction in her monthly goals, to reflect that she was absent for 57% of the working days in February 2006. The result shows that she still would not have met all her goals. Id. And when Kroninger's actual results for March 2006 are compared to a 40% reduction in her monthly goals to reflect that she was absent for 36% of the working days in March 2006, she still would not have met any of her Activations goals for the month. Id.

On the basis of this evidence, I conclude that Kroninger has not demonstrated the necessary element of prejudice in her interference claim, and that this claim should be dismissed.

4.    Wrongful discharge claim

a.    Adequate alternative remedies

Under Oregon law, the availability of a common law remedy for wrongful discharge is conditioned upon the absence of an adequate statutory remedy. Robinson v. U.S. Bancorp, 2000 WL 435468 at *4 (D. Or. 2000), adopted April 20, 2000; Anderson v. Evergreen Int'l Airlines Inc., 131 Or. App. 726, 7343 (1994). Where the legislature has adopted "virtually all remedies that would have been available at common law," the statutory remedy is exclusive. Id., citing

Farrimond v. Louisiana-Pacific Corp., 103 Or. App. 563, 567 (1990).

Decisions in this district are not consistent on the issue of whether Title VII precludes a wrongful discharge claim. Among the decisions holding that Title VII does not preclude a wrongful discharge claim are Russell v. Bob Frink Chevrolet, Inc., No. CV 95-252-PA, Opinion (D. Or. Sept. 8, 1995) Hodges v. Trailblazers, Inc., No. CV 96-148-AS, Findings & Recommendation (D. Or. Aug. 28, 1996), adopted by Judge Jones (D. Or. Jan. 27, 1997); Jorgenson v. Fred Meyer, Inc., No. CV 95-1861-HA, Opinion (D. Or. May 9, 1996)(noting that the most recent decisions within the district had held that Title VII does not preclude a wrongful discharge claim); Coleman v. Pig n' Pancake, Inc., No. CV 94-405-ST, Opinion (D. Or. Jan. 22, 1996); Byer v. Oregonian Publ'g Co., No. CV 97-1170-KI, Opinion (D. Or. Nov. 9, 1998); Kent v. Liberty NW Ins. Corp., No. CV 98-635-JE, Findings & Recommendation (D. Or. Sept. 18, 1998); Wilson v. Tarr, Inc., No. CV-99-1412-HU, Opinion at pp. 12-13 (D. Or. Sept. 8, 2000); and Henry v. Portland Development Commission, No. CV 06-712-HU, Findings and Recommendation (D. Or. Oct. 18, 2006). Compare Garcia v. Liberty Homes, No. CV 05-31-PK, Findings & Recommendation (D. Or. Mar. 9, 2006)(Title VII claim preempted wrongful discharge claim premised upon same conduct); Speed v. Adidas America Inc., No. CV 1430-PK, Findings and Recommendation, adopted by Judge Brown, 2006 WL 897978 (D. Or. Apr. 6, 2006) and Ovchinikov v. Oak Valley Auto Sales & Leasing, No. CV 03-905-AA, 2004 WL 2889771, at * 9 (D. Or. Dec. 13, 2004)(plaintiff's claims under "federal and state law," which included Title VII and state

Findings and Recommendation Page 50

statutory discrimination claim, precluded wrongful discharge claim when premised on identical allegations). I adhere to my own conclusion in Henry that Title VII does not preclude a wrongful discharge claim.

The statutory remedies for violation of the anti-retaliation provisions of OFLA are injunctive relief, reinstatement, two years' back pay, and attorney's fees and costs, but not compensatory damages or punitive damages. Or. Rev. Stat. § 659A.885(1),(2). In Cantley v. DSMF, Inc., 422 F. Supp.2d 1214, 1221 (D. Or. 2006) Judge Stewart of this court held that "an award of merely equitable relief is inadequate to preempt a wrongful discharge claim." In Paugh v. King Henry's, Inc., 2005 WL 1565112 at *7 (D. Or. June 30, 2005), Judge Stewart held that a statutory remedy which offset the omission of punitive damages with a provision for recovery of attorney's fees provided an adequate statutory remedy to compensate for the injury done to a wrongfully discharged employee. However, in Paugh, the statutory remedy included compensatory damages, which are not recoverable under OFLA. The absence of a provision for compensatory damages makes the statutory remedy inadequate. See Paugh, 2005 WL 1565112 at *6, Marshall v. May Trucking Co., 2004 WL 1050870 (D. Or. April 6, 2004).

OFLA was amended in 2007, ORS 659A.183(2), but the remedies section applicable to that statute, ORS 659A.885(1), provides only for equitable remedies, two years of back pay, attorney's fees, and costs. Under the logic of Paugh, these remedies are not sufficient to preclude an action for wrongful discharge. I conclude that the

Findings and Recommendation Page 51

wrongful discharge claim is not preempted by other remedies.

b.   Wrongful discharge

A wrongful discharge claim requires the plaintiff to show that there was a discharge, and that the discharge was "wrongful." Robinson at *5, citing Moustachetti v. Oregon, 319 Or. 319, 325 (1994). The "wrongful" element must be either: 1) a discharge for fulfilling a societal obligation or public duty; or 2) a discharge for exercising a job-related right involving an important public interest. Draper v. Astoria Sch. Dist. No. 1C, 995 F. Supp. 1122, 1127 (D. Or. 1998), *abrogated in part on other grounds*, Rabkin v. Oregon Health Sciences Univ., 350 F.3d 967 (9th Cir. 2003).

FedEx asserts that Kroninger's claim, based on the second category, must fail because she cannot show that any protected activity she engaged in was a "substantial factor" in the decision to terminate her. Estes v. Lewis and Clark College, 152 Or. App. 372, 381 (1988). Kroninger has not responded to this argument. Nevertheless, as discussed above, I have concluded that Kroninger has generated an issue of material fact on whether her participation in the Alert Line investigation was a substantial factor in the decision to terminate her. I recommend that the motion for summary judgment on the wrongful discharge claim be denied.

5.   IIED claim

The elements of IIED are 1) that the defendant intended to inflict severe emotional distress on the plaintiff; 2) that the defendant's acts caused the plaintiff severe emotional distress;

and 3) that the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct or exceeded any reasonable limit of social toleration. <u>McGanty v. Staudenraus</u>, 321 Or. 532, 543 (1995). Oregon cases which have allowed claims for IIED to proceed typically involve acts of psychological and physical intimidation, racism, or sexual harassment. <u>Robinson</u>, at *5.

Whether a complaint sufficiently alleges conduct that constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law for the court. <u>Babick v. Oregon Arena Corp.</u>, 160 Or. App. 140, 150 (1999), *aff'd in part, rev'd in part on other grounds,* 333 Or. 401 (2002).

FedEx asserts that Kroninger's IIED claim against FedEx is barred by the Oregon Workers' Compensation Act, because that law preempts all claims that are based on respondeat superior liability. Kroninger concedes the point and agrees to dismiss her IIED claim against FedEx. I therefore recommend that FedEx's motion for summary judgment be granted on the IIED claim, and that this claim be dismissed.

This leaves only the IIED claim against Marchetti. She moves against the claim on the ground that it is time-barred, pointing out that Kroninger testified at her deposition that her IIED claim was based on the events of September 28, 2005 and "anything leading up to that was inappropriate behavior." Kroninger dep. 428:24-429:23. Marchetti points out that these actions all occurred more than two years prior to the filing of the complaint on November 28,

Findings and Recommendation Page 53

2007 and are therefore barred by the two-year statute of limitations on tort claims. Or. Rev. Stat. § 12.110(1).

///

In response, Kroninger argues that her cause of action accrued in either February 2006, when she met with her doctor, or March 2006, when she met with the nurse practitioner who diagnosed her with post traumatic stress disorder. She argues that "until the severe emotional distress is actually suffered," the claim does not accrue, and it was not until February-March 2006 that she fully understood or acknowledged that she had been victimized by Marchetti.

FedEx counters that Kroninger's deposition testimony does not support the contention that she did not suffer severe emotional distress before February or March 2006. For example, when asked if she had "any ramifications ... after September 28, 2005," she said, "I think that I did, and I internalized a lot of it..." Kroninger dep. 359:21-25.

Kroninger was also asked when her alleged fearfulness, trouble sleeping, bad dreams, depression, and not wanting to go out started. Id. at 463:10-15. She answered, "I think some of it did start shortly after the incident," including the anxiety and being nervous and fearful. Id. at 463:16-17. She testified that she also had a nervous stomach in October 2005, id. at 464:2-14, and when asked for any other symptoms she had after September 28, 2005, she answered,

> Well, I think that I was in a lot of shock for a long
> time. I couldn't believe that that occurred. And then it

Findings and Recommendation Page 54

began to manifest itself in other ways, you know, just...I don't know if that made [the sinus problems] worse...

Id. at 464:17-25. FedEx contends that there is no evidence from which the court could conclude that Kroninger did not suffer from emotional distress symptoms before February 2006, and that the only reasonable inference from Kroninger's testimony is that her emotional distress began shortly after September 28, 2005 and, at most, escalated in February or March 2006.

FedEx argues that "it is the distress which must be severe, not the physical manifestations." Rockhill v. Pollard, 259 Or. 54, 63 (1971), so that the existence of severe emotional distress symptoms shortly after September 2005 caused her IIED claim to accrue. This argument is persuasive. I recommend that the motion for summary judgment on the IIED claim be granted, and that the claim be dismissed.

**Conclusion**

I recommend that defendants' motion for summary judgment (doc. # 43) be GRANTED with respect to the claims under OFLA for lack of proper notification and interference, and the IIED claim. I recommend that the motion be DENIED with respect to the affirmative defense to sexual harassment claims under Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1988), the retaliation claims under Title VII and Or. Rev. Stat. § 659A.030, and the wrongful discharge claim.

**Scheduling Order**

The above Findings and Recommendation will be referred to a

Findings and Recommendation Page 55

United States District Judge for review. Objections, if any, are due March 5, 2009. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due March 19, 2009, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 18th day of <u>February</u>, 2008.


<u>    /s/  Dennis  James  Hubel   </u>
Dennis James Hubel
United States Magistrate Judge

Findings and Recommendation Page 56